cases, Christian v. James 25384, and Mr. Patterson, you get to go first this time, and you're reserved two minutes for rebuttal. Yes, thank you, your honors. Pete Patterson for the appellant this time, and this time the court should reverse because the district court incorrectly held that New York can ban firearms at all parks in the state. This case is different from Antoniuk in two critical purposes. First, we've established that there was no founding era tradition of banning firearms in places of public congregation. Antoniuk cited one 1792 North Carolina statute, but as we've established, that was not a statute passed by the North Carolina legislature. That was the statute of Northampton, which a private North Carolina lawyer was of the opinion was still in effect in North Carolina, but even if you were right about that, what Bruin has said that is a binding interpretation of that statute is that by the time of the Antoniuk didn't just cite the Northampton statute in support of this provision, correct? In terms of the founding era, yes, it cited there was a Virginia statute that required terror, and then there was this North Carolina which said did not require terror, but what we've now established is that there was no ban on peaceable public carry anywhere in the country at the founding. Okay, but in addition to those cases, there were other cases cited, correct, non-founding era? Yes, there were statutes that were after the 14th Amendment, but what the elimination of this statute does is establish that those laws now are not in continuation with some founding era tradition. Let's take a step back though, because even if they have the interpretation that you proffer, which I think has support, they still demonstrate at the founding era that there was a concern about public safety at fairs and markets, so the why is the same. The how may be different. They drew the line at, you know, you have to be terrorizing somebody, but the why is exactly the same, that there's something about fairs and markets that we need to regulate guns for public safety purposes, yes or no? Well, no, because they say fairs and markets nor no part elsewhere, so there was nothing special. They said you can't carry a gun in this terrorizing manner anywhere in public, and so what we need to do, and even if it were limited to fairs and markets, that wouldn't make a difference, because what Bruin says is we need to strike the balance that the founding era struck. There's something inconsistent. It's sort of silent in the founding era, but then you do have, as Judge Lee pointed out, and I think you would concede, overwhelming reconstruction era legislation at the municipal level and at the state level doing exactly what the New York State is seeking to do here, right? It's not overwhelming at all. First of all, there were ones before 1868, Central Park in 1858, Prospect Park in 1867, Philadelphia in 1868, Chicago in 1866, then after 1868, San Francisco, Boston, Spokane,  All of these municipalities are passing identical, similar regulations with respect to parks, and yet you're asking us to not consider that. Judge Justice Scalia said in Heller, although I didn't think it was as probative as the founding era, that you should look at the reconstruction era, because those born and educated in the early 19th century faced a widespread effort to limit arms ownership by a large number of citizens, and their understanding on the origins and continuing significance of the Second Amendment is instructive. So why is it instructive that all these municipalities and states pass these laws? I think the state points out, and you can tell me if they're wrong, that there's not a single challenge at the municipal level to any of these laws that anybody can find. There's not a peep. If this was inconsistent with the history and tradition of gun ownership and carrying, why would there have been challenges all over the place? And the only three state challenges, they point out, the three state Supreme Courts found it to be constitutional. So why shouldn't that be pretty compelling? Well, Your Honor, there are two separate strands here. One are the state laws restricting carrying places of public congregation. Two are these municipal park regulations. I'll start with the first. On the municipal park regulations, they were only in four states by 1880. Only municipalities in four states had these by 1880. So that is, we would submit, insufficient to establish a tradition by 1868. That's when the tradition needs to be in place in order for it to be a founding tradition. Even if you could consider 1868, we would submit you would need evidence of a tradition in 1791. But there's another reason why these park spans are... One case says that if you have a strong Reconstruction era evidence, some of it was before 1868 and then it continued in a massive way after 1868. That somehow, that that's... Well, the tradition would need to, even if you were looking at 1868 as your kind of baseline, the tradition would need to be in place by 1868. So you could look for things after as confirmation of that, but there... The tradition was in place because these urban parks were beginning. They were beginning to develop and as they developed, for the ones that developed, like Central Park prior to 1868, it was put in place. And then I think almost everyone afterwards. Right. Again, there were only four by 1880. I would also say a reason why these parks are not... Well, urban parks were put in place prior to 1868 where the municipality said, you know, we don't need a gun restriction here. We're fine with that. I don't think there's any, right? Well, we don't have... There are more parks than just these Olmstead parks. But the reason why... To that right, I mean, would your position be that, you know, Boston Common and other commons and greens actually, you know, even though they're used for other purposes too, they all are used in part for recreation? Yes, that's the other way this is distinguishable from Antonia, because we've established that that's the case. Boston Common, George Whitefield preached over 20,000 people in 1743. And we cite the Olmstead landscape architect book. That's not the same. One instance where a park was used for, you know, an assembly of that type is not the same as its, you know, daily recreation. Well, we have evidence that that was the daily use of it for walks and other public assemblies. And we have the landscape architect book. A landscape architect from Harvard, 1928, in a book collecting Olmstead's papers. I didn't have that evidence. I just wanted to note that. But I have a question about this timing thing. I mean, I would think that you would have one possible answer to Judge Bianco, which is that what's going on in Heller is Justice Scalia is identifying a continuous tradition from the founding. And so that's the relevance of the Reconstruction Era material. But in this particular context, when we're talking about what's an infringement or an abridgment of the right, the Surveying Court has reserved judgment over whether the relevant time is the adoption of the Second Amendment or the adoption of the Fourteenth Amendment. And so I guess my question is, if we think that there isn't a national tradition at the time of the adoption of the Second Amendment, but there might very well be at the time of the adoption of the Fourteenth Amendment, what do we do with that? Is there a reason to privilege one over the other? I think you have to privilege 1791. The Supreme Court has held, Bruin held, and many other contexts has held, that the answer has to be the same for the states and the federal government. We're not going to have two different rules. So then the question is, what makes more sense, 1791 or 1868? Why does it have to be the same? The Supreme Court has held that for this court. But I think, theoretically, it would be that... I don't mean to bound by Antinouk on that. Antinouk said we don't have to pick. There's a long discussion of that precise question in Antinouk. And Antinouk said we don't have to pick between the founding. It rejected the Third Circuit case that suggests that somehow you have to pick one versus the other. Well, that was in the context of the case where they said they thought it was consistent between the two. And we've now said it's not consistent between the two. So now the court does have to pick one or the other. We don't even think it's consistent in 1868. But 1791 is when the right is adopted. There's one Second Amendment. 1868 is only about its scope. Where is it going to apply? It's not about changing the contours of the right. I would like to say one other thing about these rules. I mean, is this correct? I mean, when we are looking at whether there's a historical tradition of regulation of firearms ownership, we're determining whether a certain kind of a law would be considered an infringement of the right. So we're sort of interpreting the word infringe in the Second Amendment. And I suppose the time might hinge on why you think the Second Amendment applies to the states. So if you agree with Justice Thomas that the reason why the states have to recognize the right to bear arms is because the 14th Amendment says they can't abridge the privileges or immunities of citizenship, then maybe we're interpreting the word abridge. And that was adopted in 1868. But if you think the reason why the states have to recognize the right to bear arms is because it was incorporated through the due process clause of the 14th Amendment, then you're not interpreting anything in the 14th Amendment. You're interpreting the word infringe in the Second Amendment. And that was adopted in 1791. So is it possible that the reason the Supreme Court hasn't settled on a time is because they also haven't settled on how the Second Amendment applies to the states? That's possible. I don't know if the infringe issue would bear into it because I think the only thing infringe does in the analysis is the result. At the end result, you do the Bruin analysis. Is the text implicated? Yes. Is there historical support? Yes or no. If no, then the right is infringed. Infringed just meant to violate. So that infringe is the outcome of the analysis. So you're trying to figure out what the public would have considered to be an infringement. Right. What I would say is let's say you were a judge in 1867 seeking to interpret the Second Amendment. You would look under at least the principles that Bruin established. What did this mean in 1791 when it was adopted? So similarly, when you're looking to incorporate that in 1868, anybody interpreting that— Even if I thought that the reason why the Second Amendment applies to the states is because the 14th Amendment says that states aren't allowed to abridge the privileges or immunities of citizenship and the right to bear arms is a privilege or immunity of citizenship. The word abridge just sort of refers back to the notion of infringement under the Second Amendment. Correct. It's still that Second Amendment right that is being incorporated regardless of the means through which it's incorporated. So does that mean that your position is even if there was a national tradition of prohibiting firearms carrying in parks at the time of the 14th Amendment, if it wasn't at the time of the Second Amendment, then that was unconstitutional from the get-go?  I think it would—perhaps it could go the other way under a privileges or immunities analysis if there wasn't a right in 1791, but the right had expanded by 1868 to such an extent that we're not necessarily relying on the Second Amendment, but there's some other— And why would it be that when they adopted the privileges or immunities clause or the due process clause, they were incorporating the right as it was understood in 1868 as opposed to the way it was understood in 1791? I think they're incorporating those rights and what you would do in that time frame if you're seeking to interpret what does that right mean, you would say what did it mean when this was adopted? So I think it would be the same question that we're asking today. What did this mean in 1791? It's not what is this right? It's just whether we're going to apply it to the state. It's not in terms of its content. As Judge Bianco observed, we said in the Antenna decisions that actually we look at both and either one is more important than the other, which I guess takes us to this question of like does that bind us now on the merits? I think it's a— Because both parties here want to depart from those decisions. Right, right, right. You both seem to agree that it's not binding. But why is that? Because this is the same case, because that was the P.I. and this is the merits, and so we can revisit things as law of the case? Is that the idea? Well, this—we actually did not have a Parks case in Christian— You did have a Parks case, but you were part of the litigation. We were part of the litigation. Yes, yes. So then does that mean it's the same case? So we think about law of the case or does that mean it's a precedent? I think it does—I think it does—the law of the case principles do come in. I don't know why the party to a different case would be bound to a greater degree than the party to the case. Specifically, but there's numerous circuit cases out there that have said conclusions of law in the context of a plenary injunction decision by our court are binding. I'll give you—the Ninth Circuit said in a case called Rancher's Cattlemen, the district court should abide by the general rule that our decisions at the plenary injunction phase, they do not constitute law of the case, but any of our conclusions on pure issues of law, however, are binding. The Tenth Circuit said the same thing in 2020 in Fish. In Howe, the Sixth Circuit said, when a court reviewing the propriety of a plenary injunction issues a fully considered ruling on an issue of law with the benefit of a fully developed record, then the conclusions with respect to the likelihood of success and merits are the law of the case. That's a law of the case one. But there are many ones that suggest that a conclusion of law, you know, the likelihood of success determinations in a historical record could be further developed. That's not binding. It's not law of the case. But as to whether or not we should apply reconstruction era statutes or not, that's just a simple conclusion of law. Well, I have two answers. There is no conclusion of law in Antoniuk of what to do if there's a difference between 1791 and 1868 because the court did not confront that situation. So anything it said about that was dicta because that situation was not before the court. In terms of a matter of law in Cayuga Indian Nation, this court said that finding of the fact and conclusions of law made in a preliminary injunction proceeding do not preclude reexamination of the merits at a subsequent trial. And also in Antoniuk- Right. So that's law of the case. Right. So that's why I was kind of suggesting that this is the same litigation. I understand that it involves a number of different parties.  And maybe it's not exactly the same party, but you were a party- Correct. Correct. To the Antoniuk decision. Yes. And so it seems like we might be able to revisit it. If you were not a party to it, then we'd be thinking about precedent. Well, in Antoniuk note 126, what it says is that this decision does not determine the ultimate constitutionality of the challenged CCIA provisions which await further briefing, discovery, and historical analysis. But that's just accurate. It doesn't determine the ultimate one, but it made a bunch of legal conclusions on the way to reaching reality.  I was just going to say it says both in this case and perhaps in other cases. So it acknowledged that other cases would not be valid. In a preliminary injunction motion context, we interpret a statute and say this is what the statute needs. Are you suggesting that that's not binding on future panels of this court because of the context of a preliminary injunction? Is that what you're suggesting? Well, it would not be binding on the same parties coming before the court in the future because the court has explicitly said it's not law of the case. We can revisit things. And so it would just be a little odd to say it's not binding on the same parties if they come before you, but it is binding on other parties. It's binding on everybody. If we interpret a statute in a full briefing, but it's in the context of a preliminary injunction, that's binding on future panels. We're not talking, we're not applying it to the facts of the case that could be more fully developed on the record. We're interpreting a statute, right? All I have is the Cayuga Nation case which generally said no, I don't have a case of the contrary. Why would it be odd? So if it's part of the same litigation, then it's pretty well established that a court can revisit its earlier rulings as part of the same litigation. And we even have a bunch of factors we consider about revisiting earlier decisions and departing from the law of the case, even if it is law of the case. But if it's a separate decision, then it's a matter of precedent and then maybe it's binding. So if you were not part of the earlier litigation, let's say you came along with a different claim ten years later, that wouldn't be weird to think that the earlier decision, even if it's a PI, would bind the panel that decides that claim, right? So isn't it important that this is the same litigation? I think it is important if, you know, on the most restrictive view, yes, this is the same litigation. It's not binding, but I do think typically that things are more binding and preclusive in the same litigation versus other litigation. But anyway, the question there is likelihood of success. And so even if it's fully binding, the only question they're answering is likelihood of success. And now that's not what we're answering here. Yeah, but if the panel decides the reason why there's a likelihood of success is because this is what the Second Amendment requires or the reason there's likelihood of success is because this is what a statute means, that's a legal conclusion that's necessary to the holding about whether there's likelihood of success, right? It's still in the context of likelihood of success. But again, even if we were to give full weight to that here, there was no holding on the question of what do we do if there's a difference. Okay, right. So you're saying because they just said we look at both and they identified a continuing tradition.  Can I ask another question about the government's interests? So, and also this is in Antinuk, that on the one hand, there's an interest in preserving quiet contemplation in a park. On the other hand, there's a tradition of restricting guns in crowded public forums. Are those two things consistent? I mean, can something be simultaneously a place of quiet contemplation and a crowded public forum? I think the Venn diagram where those two overlap is kind of small. But perhaps if you had, you know, and this is a point I was going to make with respect to the Olmsted parks. These are a particularly bad place to look for this nation's tradition because they were a conscious break with that tradition. What they said is we had these multi-use places in urban settings where people could carry, you know, people were growing crops on the commons, they were engaging in walks, they were doing all sorts of things. We saw that in the briefing. Yes, yes, yes. Let's give Ms. Koko a chance. Okay, okay. I was trying to answer Judge Menashe's question. Thank you, Your Honor. Okay, Ms. Koko. So I want to start with this issue of what is binding from Antonyuk. And I recognize this is a complicated question because of the way Antonyuk was litigated. Our position is, I think, exactly what was articulated by Judge Bianco, which is that Antonyuk should be treated as any other precedential opinion. And here in the parks appeal, we do not have the same parties because my friends on the other side were not parties to the parks issue in Antonyuk. That was a separate case. There's no law of the case issue, so you should treat this as any other precedential opinion. No, but there's a difference between what Antonyuk concluded about the historical record. That's not binding on us. You would agree that if there's more evidence regarding the historical record, whether it relate to the Boston Commons or any other parks or anything like that, that's not binding on us, right? So I don't think either side has cited case law on point on that. We have the law of the case doctrine. I, frankly, have not been able to find case law on point on that. But at the most, that would only apply to new record evidence. And here, plaintiffs have certainly not come forward with historical evidence to dispute Antonyuk's conclusions. In fact, the state came forward with more historical evidence. Well, they came forward on the Northampton question. They came forward with, I thought, pretty significant evidence with respect to whether or not it applied to generally or to people who were terrorizing others, right? They cited this North Carolina Supreme Court case. That seemed pretty clear. They interpreted it as only applying when you're terrorizing someone, right? So we think that Antonyuk got this correct, that the statute of Northampton creates two separate prohibitions. The first is on appraise, and the second is on carrying in fares and markets. I don't think it's correct, but before we talk about that, just about the binding character of it. Even though I understand how all of this historical, these historical examples and analogs looks like evidence because it's a lot of individual data points, but it is ultimately a legal conclusion as to what the national tradition of regulation of firearms ownership was. That is not a fact question about these particular parties, right? So even the prior decisions about what the meaning of the earlier statutes is, those are legal conclusions that the prior panel made. If legal conclusions are binding on us, that might be binding too, right? I think that's correct. I think Antonyuk specifically recognized as to the parties in those cases that they might come forward at summary judgment with additional historical evidence, so that's what we're relying on there. But generally, yes, I think we would agree that the principles articulated in Antonyuk are binding on future panels. Otherwise, these questions would never be settled. You all seem to agree that the conclusions that the Antonyuk panel made about the meaning of the founding era statutes about hunting are binding on us, right? So why is that not binding but other legal conclusions are? So there, I think we're just making a very narrow point based on what the court said in Antonyuk, which is there's these specific terms to which there's not historical evidence of what they mean, and based on the evidence you have so far in the record, on this preliminary record, we're not confident that they established a historical tradition. So it's just a happenstance that the panel said, you know, we're not totally sure about this, but if they hadn't added that caveat, then that would just be binding and it wouldn't matter what other historical evidence turned up later? I'm not sure how the panel would have addressed that question. But I think here, so first of all, I think there's no dispute that the principles of law decided in Antonyuk are binding. So things like the idea that 1868 is a focal point of the analysis for state law, which was also reaffirmed recently in Zirka. So even if you think Antonyuk is a preliminary injunction decision and that matters, we've got Zirka, which is a merits decision. And so those are certainly binding. And here, I don't think the court needs to go further than that because, as Judge Bianco acknowledged, there's overwhelming historical evidence from 1868 that is also consistent with evidence from the founding. But just the fact that even if we accept that it's a focal point, it doesn't tell us what to do if the evidence from the two periods points in opposite directions, right? Well, there is not evidence pointing in two directions here. There's certainly no positive founding-era law that plaintiffs have identified saying that the state can't do this for the simple reason that, as Antonyuk recognized, public parks were not a feature in the founding era. These commons and greens were primarily for utilitarian purposes. They were not space set aside. Well, let's agree to some other conclusions in light of more. So just, whatever, for purposes of a hypothetical, just to test the binding character, let's say I was persuaded by some of the additional evidence about greens and commons at the founding that actually that was the closest analog to contemporary public parks, and guns were not restricted in those spaces. And so the founding-era tradition is not one of firearms restriction. But then I was persuaded that, you know, in the mid-19th century, there did emerge this tradition of restricting guns in public parks. Then they would point in opposite directions, right? So I don't think there could be a conflict on this evidence, but just assuming there is a conflict for the sake of the hypothetical. That's not something that anybody has decided. Then I think some of the leading proponents of originalism would acknowledge that you should look to Reconstruction-era evidence when you're interpreting the meaning of a state law. And I would cite Justice Thomas and Justice Scalia, who have said this in the First Amendment context. And in addition, the counsel for the challenger in Bruin was asked this question by the Supreme Court and said, not only is Reconstruction-era evidence relevant, but I would primarily rely on it. And when Justice Thomas is acknowledging a scholarly debate in Bruin, he's also acknowledging that some people are arguing that you should primarily rely on Reconstruction-era evidence. And so the reason why would be because it's the 14th Amendment that makes it applicable to the state, and so actually the understanding of what an abridgment or an infringement at that time might be more appropriate, right? Yes, and Justice Scalia has said, I don't think the 14th Amendment was time-warping the Reconstruction-era states back to the founding era. And so that supports that idea. I don't know. Maybe the founders, the framers of the 14th Amendment might have thought, whatever the Second Amendment means, we're going to apply it to the states. And so it might actually be time-warping it. Well, again, the Court certainly does not need to decide this thorny question here. We have Antonyuk, which is binding. We have Zerka, which re-acknowledges the same point from Antonyuk. One more thing on that, right? So, like, as I was saying, the way it would make the most sense to say that the Reconstruction-era is the most important is if you have, if you agree with Justice Thomas that what we're really interpreting is the privileges or immunities clause, because that's what means states have to recognize the right to bear arms. But then Justice Thomas himself in Bruin is really primarily looking at founding-era evidence. Like, he does not seem to privilege the later evidence, right? I think that Bruin is definitely looking at both time periods and explicitly leaving this as an open question. Then Rahimi, again, they say in footnote one, just repeating that same text from Bruin, we're just going to leave this scholarly debate as an open question. And so I think the Supreme Court has really not been clear about their position on whether one is the primary source of evidence. But this court has decided that open question. I just want to reiterate, Antonyuk did decide that Reconstruction-era evidence should be a focal point of the analysis. And here... Well, it is a focal point. And the Supreme Court has also treated it as a focal point. They consider both. But no one has, neither we nor the Supreme Court, has decided if we think that the evidence from one period leads to one conclusion, the evidence from another period leads to a different one, what to do with that. So here at the very most, there is silence in the founding era. There's certainly not a conflict. And there is overwhelming evidence in the Reconstruction-era. And I wanted to make a couple of points about that. But why does that matter about the silence? So if there isn't regulation of firearms ownership in analogs to public parks, it means that there wasn't a national tradition as of the founding. And that's the conclusion, right? There wasn't the tradition. But if there is overwhelming evidence at Reconstruction, then there was a tradition, right? So those are different conclusions, right? So I would disagree that that's a conflict. And again, this is another piece of Antonyuk that we think is clearly binding. Antonyuk acknowledged that silence doesn't indicate a conflict. The legislator is not always legislating to the extent of its authority. So if there's silence, that doesn't mean there's a tradition of not permitting states to exercise that authority. And here we have at most silence. And then we have dozens of states exercising that authority. And I just want to make one quick point, which is that... You say dozens of states. But really the evidence from the Reconstruction period is primarily the municipal ordinances that prohibit guns in parks. The state laws are about fairs and markets. And that sort of relies on the premise that parks are analogous to fairs and markets, right? So two points on that. That's exactly where I was going to go. So first, two of the ordinances prohibiting guns in parks are state legislative enactments. That's the Pennsylvania 1868. And then Michigan in 1895. So those are both state enactments prohibiting guns in public parks. So it's not the case that these are all municipal ordinances. And then as to the Reconstruction-era laws that Antonyuk was additionally relying on for the crowded public forums tradition, those are specifically regulating the carrying of firearms in social or educational settings, which we think is closely analogous to parks in this context, because they are for recreation. They are these places that are likely to be crowded. I did want to briefly address before I sit down three reasons that this court should reject plaintiffs' belated attempt to bring an as-applied challenge This is only one page of their opening brief, and perhaps, you know, the court is not going to consider it. But I just wanted to briefly note that they did not plead this challenge. They don't have standing to bring it. And then on the merits, we have adduced evidence of a historical tradition of prohibiting firearms in parks outside of urban areas. And so plaintiffs are asking for- But what's the evidence of the parks outside of urban areas? Because when it says social gatherings, you think that that covers parks outside of urban areas? So they were relying primarily on the prohibitions on carrying firearms in state and national parks, which began to emerge as soon as those parks became common. And those, again, would obviously be parks outside of urban areas. So, for example, Mackinac Island National Park was one of the first national parks in the country. By 1882, they've prohibited the carrying of firearms. That's plainly a park outside of an urban area. Same thing as to state parks. In 1885, Niagara Falls State Reservation opened in New York as one of the first state parks in the country. And again, it immediately prohibits the discharging of firearms and then subsequently bans firearms entirely in the park. But it does seem like there is an emergent tradition that starts with maybe what you might call urban parks, but then it's applied to other kinds of parks, right? So I think you can see it as one consistent historical tradition because these prohibitions are so similar. So as soon as a park appears, they immediately prohibit the carrying of firearms. And I think it would be artificial to cut off the analysis, as my friends are suggesting, at 1890. I disagree about how many statutes we have before 1880, but irrespective, I think it would be artificial to cut off the analysis at one particular point. So if we did think that the distinction between urban and rural parks mattered, and to the extent you're saying that we need to give way to the Antoinette decisions, like that panel thought that it mattered, isn't it weird to think of that as an as-applied... I mean, usually an as-applied challenge would mean that generally the law is okay, but there's something unique about the particular party challenging the law that you need to carve out an exception. But if we thought there was a tradition of regulation in urban parks, but not in rural parks, probably the majority of applications of the statute are rural parks, right? There's more land space, and there's more parks, and so on. It doesn't seem like that's a narrow exception to a generally valid rule. Do you still think of that as requiring an as-applied challenge? So the burden on plaintiffs would be to prove that there is no constitutional application of this law, and that it's unconstitutional in all of its applications. This court acknowledged that in Antonyuk, and then Rahimi said exactly the same thing, and they have not come close. But can it really be that if 99% of the applications are unconstitutional, and there is some narrow circumstance to which it can be constitutionally applied, it means that we uphold it? Is that what you think the law requires? I do think that's what the law requires, based on what the Supreme Court said in Rahimi, which is that to prevail, the government need only show that the challenge provision is constitutional in some of its applications. We've clearly done that here. That's what the court acknowledged in Antonyuk. So even if the court were, you know, on this facial challenge, which is what plaintiffs are bringing, they clearly haven't met their burden. Thank you. Mr. Patterson, you have two minutes in rebuttal. I have several points, so I'll try to talk quickly first. With respect, you're right, Judge, that this is not traditional facts, but these are legal conclusions based on historical information that's before the court. Antonyuk acknowledged that it was only making its decision based on the historical information that's before it. So if this court has additional historical information, it can consider that. Second, there was not silence at the founding. Terrorizing carry was banned at the founding. And in Boston Common, you could not discharge a firearm, except for in self-defense. So that is the balance that the founders struck, not no caring for defensive purposes. The how and the why of the- In Antonyuk, as Ms. Coco pointed out, Antonyuk said that legislators don't always legislate up to their constitutional limit of their powers, to the full extent of their powers. What's your response to that? Well, the way that the Bruin analysis works is you look at, if the plain text is covered, then it's the government's burden to prove a tradition of regulation. You can't prove a tradition of regulation with silence. It's not about what the people thought. It's about you can't prove a tradition with nothing. And so the Second Amendment provides the relevance. So Bruin doesn't really require us to determine whether people in that time period would have thought that if a state were to regulate in a certain way, it would be considered unconstitutional. Bruin requires us to see, to identify a tradition where some governments were actually regulating in that way. Correct. Correct. And then with respect to facial as applied, we didn't in any way waive, and as applied, we said this is unconstitutional. We want an injunction. And what the Supreme Court has said, the facial as applied distinction goes to remedy. And so if we've established that this is unconstitutional to some extent, we're entitled to that remedy. Right, but the remedy you're seeking is not the usual as applied challenge, as Judge Menachie was noting. The party is usually saying, well, this statute is basically okay, but it's unconstitutional to apply it to me in this circumstance. And so if you're not articulating a circumstance where, oh, this particular, if you're not pleading that, oh, Mr. Christian wants to go do X, and under this law, he cannot do it, therefore grant an injunction saying, yes, he can bring his gun to this location. That's the typical as applied challenge, and that wasn't pleaded here. Well, at the summary, at the pleading stage, we said he wants to carry and include in parts, including on trails and paths. He said strike down this provision. Declare it unconstitutional and don't let it be enforced. Judge Menachie didn't say something that goes to his particular assertion of rights here. Right, and what the Supreme Court has said is there's no magic words that you need to say that facial as applied goes to the scope of the remedy. So we've shown he wants to carry in Stigglemire Park, which is not in a city. What Antonio drew a line between cities and other places, cities and urban, that used essentially as a synonym. So that's in a town, and so we want to carry there for one example. Even if I were to agree with you that it's about the remedy, I mean, in this case, didn't the district court basically say we haven't really developed a distinction between urban and rural. There might be such a distinction. You can sort of pursue it on appeal. But, like, there aren't there disputes about really what counts as urban and rural. Like, it's not really clear where that distinction is. So how can we even fashion a remedy? We just announced that, you know, there's a tradition in urban parks but not rural parks. But, like, no one has defined the contours of those categories. Well, one line, yes. What should we do? Should we remand for the district court to decide the boundaries of those categories? Well, one line you could draw would be, again, we don't agree with this tradition, but just for the sake of argument, it would be between parks in cities, incorporated cities, versus other sorts of parks. And the parks that he wants to carry in are in towns, and in addition is forest preserves. So that's one line you could draw. You could remand. We would be happy to provide the court with extra briefing if that would be helpful. So you could do that. But in terms of how facial as applied works, I believe Your Honor is correct. And Heller was a facial challenge. And there are certain, for example, an automatic firearm, an automatic handgun, Heller suggested you could ban. But that didn't mean that that law was not facially unconstitutional. And so the reason this is distinct from Rahimi is there was a separate statutory subheading for somebody who was found to be a danger. And there was another one that didn't require somebody to be found to be a danger. It wasn't just that, well, we could have regulated this if we wanted to. So actually, our view of it would be, even if you can ban firearms in urban parks, it's not a constitutional application of this statute to prosecute someone for carrying a firearm in an urban park because the government would not have to prove that. It was the same thing in Lopez. The U.S. Supreme Court struck down- They're allowed to prove what? That it's an urban park because it's the high element of the statute. Right. Right. If that were a valid tradition, then the government could do that. If we think that there isn't a tradition that applies to rural parks, it means that a blanket statute that prohibits carry in parks is unconstitutional because it doesn't require showing that it be an urban park. If there isn't a tradition that generally banning carry in parks writ large is okay, then yes, this is facially unconstitutional. Even the way you articulated it, that an urban park is a park in a city and a rural park is a park in a town, it's not totally obvious to me that that distinction makes sense. If you have a town where the park is in the town square and surrounded by commercial- It looks a lot like an urban park. Maybe a rural park is just more of a nature preserve than the town square or something. We don't really have development of that distinction, right? We don't have a lot of development. Shouldn't we want something more from the district court? Perhaps. Again, we'd be happy to brief the thing, but if it allows us to live another day, we would be happy whatever this court would want to do on that. Thank you, Your Honor. A reserved decision. That was a lot of arguing. We really appreciate it. Have a good day.